UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 15-80130-CIV-MATTHEWMAN

TOMMY H.D. DRAUGHON,

     Plaintiff,

v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security
Administration,

     Defendant.

_____/

FILED by _____ D.C.

AUG 2 3 2016

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## **ORDER ON MOTIONS FOR SUMMARY JUDGMENT [DEs 22, 23]**

THIS CAUSE is before the Court upon Plaintiff, Tommy H.D. Draughon's ("Plaintiff")

Motion for Summary Judgment [DE 22], and Defendant, Carolyn W. Colvin, Acting

Commissioner of Social Security Administration's ("Defendant") Motion for Summary Judgment

[DE 23]. The parties have consented to magistrate judge jurisdiction. [DE 18]. The issue

before the Court is whether the record contains substantial evidence to support the denial of

benefits to the Plaintiff and whether the correct legal standards have been applied. *Lamb v.*

*Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

## I. **FACTS**

On December 12, 2011, Plaintiff filed an application for supplemental security income,

asserting a disability on-set date of January 1, 2008. [R. 17].[1]  The claim was denied initially and

upon reconsideration. *Id.*  Following a video hearing on November 18, 2013, the ALJ issued a

decision on January 9, 2014, denying Plaintiff's request for benefits. [R. 17-30]. A request for

_____

[1] All references are to the record of the administrative proceeding filed by the Commissioner in Docket Entry 15.

review was filed with the Appeals Council and denied on December 29, 2014.   [R. 1-3].

## A.   Hearing Testimony

The ALJ held a video hearing on November 18, 2013. [R. 36].   Plaintiff's counsel stated that Plaintiff had only had two jobs in the past—as a clerk in the grocery store owned by his parents and a as part-time personal trainer—and that he has not worked since 2003.   [R. 39-40]. Counsel stated that Plaintiff had never been a male model and that the record was incorrect in that respect.   *Id.*   The ALJ pointed out that Plaintiff had filled out the work history report in his own handwriting and had stated in that document that he had been a male model in the past.   [R. 41]. The ALJ stated that the information about Plaintiff's past jobs was signed and in Plaintiff's handwriting and that she was not going to find that document to be credible.   [R. 42].   Plaintiff claimed that he had told an employee at the Social Security office that he had wanted to be a male model, not that he had actually been one, and that he may have made a mistake in the written document regarding his past employment.   [R. 42-43].

Plaintiff testified that he is single and lives with a family friend.   [R. 45].   He has one child who lives in Atlanta with her mother.   [R. 45-46].   Plaintiff graduated from high school. [R. 46].   He gained 40 pounds in the year or two prior to the hearing due to his depression and the medications he was taking.   [R. 46-47].   Plaintiff has a driver's license, but does not drive because he cannot turn his neck.   [R. 47].   He stopped working at the grocery store in 2003 because he had neck and back pain, could not bend down and put up stock, and could not stand in one place for more than 10-15 minutes.   [R. 48].   Plaintiff explained that all of these problems stemmed from a severe car accident in 1985, after which he was in the hospital for two and a half months.   [R. 48].   He injured his neck, leg, teeth, shoulder, and back in the accident, and had a blood clot on his brain.   *Id.*

2

Plaintiff explained that he was a personal trainer on a part-time basis from 1990 to 2003 at his parents' gym and a full-time grocery store stocker at his parents' grocery store from the time he was a boy until 2003. [R. 49, 56]. He again stated that he had never been a male model but that he had aspired to be one. *Id.*

Plaintiff testified that he experiences headaches almost every day, daily neck pain, daily pain in his lower back, a bad memory and concentration, tingling down his fingers and arm almost every day, pain in both legs from his sciatic nerve, bone spurs in each heel that require surgery, and torn ligaments and tendons in the left ankle that require surgery. [R. 50-52]. He explained that he gets shots every two weeks in both heels and his left ankle and that his feet are dark and swollen from torn ligaments. [R. 52]. Plaintiff stated that he has to sit up for five hours a day with his legs elevated above his head or they "swell up real big." *Id.* He testified that he has high red blood cells and that he was given a pint of blood once per week. [R. 53]. He also has high blood pressure and high cholesterol. *Id.* Plaintiff stated that he has diarrhea every day. *Id.* He had an aortic aneurism in 2009 and had an emergency surgery while in the hospital. *Id.*

Plaintiff stated that he can only sit for approximately 15 minutes before he needs to change position or stand. [R. 53]. He cannot stand in one place but can move around for 15-30 minutes at a time. [R. 54]. Plaintiff explained that he can only lift approximately 10-12 pounds, cannot reach overhead, cannot repetitively bend, cannot kneel, crawl, or stoop, cannot sleep through the night, and must take naps because of his medications. *Id.* He testified that he is on 15 prescription medications and four over-the-counter medications. *Id.* The medications make him depressed, make him gain weight, make his feet swell, and make him tired. [R. 54-55]. Plaintiff explained that he has no memory, wishes he could work, is depressed, and has issues concentrating and staying on task. [R. 55]. Plaintiff stated he is depressed but is not getting treatment for his

3

depression because he does not have insurance or the money to do so.  *Id.*  He testified that he stopped using steroids in 1996 and went to prison after that for selling steroids and for a probation violation.  [R. 55, 57].

Next, Ileana Chapman, a vocational expert, testified.  [R. 56].  The ALJ instructed her to disregard any past work due to the confusion in the record.  [R. 59].  The ALJ posed the vocational expert the first hypothetical in which an individual of Plaintiff's age and education with no relevant work history could perform physical and mental activities, but could only lift and carry 20 pounds occasionally and 10 pounds frequently, could stand and/or walk six hours in an eight-hour workday, could sit six hours in an eight-hour workday, needed to avoid concentrated exposure to temperature extremes, wetness, humidity, vibration, pulmonary irritants, and hazards such as moving machinery and heights, could only perform simple, routine tasks on the same basis over a normal eight-hour workday in a stable work environment with no more than simple decision-making, and could not perform complex and detailed tasks or meet fast-paced high production demands.  [R. 60-61].  Given those facts, the expert found that the individual could perform the job of a silver wrapper, shellfish preparer, or merchandise marker.  [R. 61-62].  The expert also cited the DOT number, national employment statistics and state employment statistics for each of those jobs.  *Id.*

For his second hypothetical, the ALJ changed the amount that the individual could stand and/or walk to only four hours in an eight-hour workday.  [R. 62].  The vocational expert responded that this change would reduce Plaintiff's ability to work at one of the three jobs by about 60% and that most light jobs require up to six hours of standing, depending on the employer.  *Id.*

For his third hypothetical, the ALJ added that the individual could only lift on an occasional and frequent basis up to five pounds, could stand for 15 minutes at a time, could sit for

4

30 minutes at a time, could never manipulate either hand, could never raise either arm above the shoulder level, could balance, stoop, or bend occasionally, and needed to elevate his legs for most of the eight-hour workday. [R. 63]. The expert stated that no jobs would fit within this hypothetical. *Id.*

Plaintiff's counsel asked the vocational expert whether, if the individual could only stand for 15 minutes at a time, sit for an hour at a time, lift five pounds occasionally or frequently, and never bend, stoop, or balance, there would be any jobs available for such an individual. [R. 63]. The expert replied that there would not. [R. 64].

Counsel then asked the expert whether any jobs would be available to an individual who could only lift 10 pounds frequently and 20 pounds occasionally, never stoop or balance, occasionally bend, occasionally reach overhead, and sit or stand for a maximum of 15 minutes at a time. [R. 64-66]. The expert stated that there would not be any jobs available for such an individual. [R. 66].

### B.   Medical Record Evidence

In reaching her decision to deny Plaintiff's benefits, the ALJ reviewed the medical evidence of record, the relevant portion of which is summarized chronologically below.

On January 19, 2012, Plaintiff presented to Dr. Mark Rogovin for a disability evaluation. [R. 297]. Plaintiff told Dr. Rogovin that he had been in good health until he was involved in a motor vehicle accident in 1985. *Id.* Plaintiff reported that his left shoulder caused pain but was mostly better, that he suffered from chronic neck pain and a limited range of motion, that he suffered from biparietal and throbbing headaches with photosensitivity about five times per week, that he suffered from chronic right lower extremity pain from the knee to the toes with dysesthesias, that he had some memory changes, and that he suffered from low back pain. *Id.*

5

Plaintiff told the doctor that his activities of daily living were limited, but he could not provide specific restrictions with regard to sitting, standing, bending, pushing, pulling, reaching, walking, lifting, climbing, or lying down.  [R. 298].

Dr. Rogovin completed a physical examination and range of motion testing.  [R. 298-99]. Defendant complained of pain when he got on and off the examining table and ambled with a slow and steady gait, complaining of back and neck pain with weight-bearing and ambulation.  [R. 298].  With regard to Plaintiff's range of motion, Dr. Rogovin found that Plaintiff's cervical spine showed forward flexion to about 5 to 10 degrees and extension to 5 degrees, lateral flexion to about 5 degrees, and rotation to the right to about 15 degrees and to the left to about 5 degrees.  *Id.* With regard to Plaintiff's lumbar spine, he could forward flex to about 20 degrees, extend to 5 degrees, and laterally flex to 5 degrees.  *Id.*  The leg raising test from the supine position on the left to about 30 degrees caused leg and back pain, and the leg raising test from the supine position on the right to about 15 to 20 degrees caused leg and back pain.  [R. 299].

On January 19, 2012, Plaintiff had an x-ray of his cervical and lateral spine performed. The study was suboptimal, and no significant or acute pathology was seen with the limits of the study.  [R. 295].  Plaintiff also had a lumbar spine series conducted.  [R. 296].  The impression was "no acute process."  *Id.*

On January 24, 2012, the Social Security Administration issued a Disability Determination Explanation finding Plaintiff not disabled.  [R. 69-75].  It was determined that Plaintiff can lift and carry 20 pounds occasionally and 10 pounds frequently, can stand and/or walk for six hours out of an eight-hour workday, can sit for six hours out of an eight-hour workday, can push and/or pull an unlimited amount, can frequently climb ramps and stairs, stoop, balance, kneel, crouch, and crawl, can occasionally climb ladders, ropes, and scaffolds, has no manipulative, visual or

communicative limitations, and has environmental limitations in that he cannot have concentrated exposure to hazards such as machinery and heights. [R. 72-73]. Moreover, it was determined that Plaintiff can perform his past work as a model as generally performed in the national economy. [R. 74].

On March 13, 2012, Plaintiff saw Dr. Ronald Seifer for a general clinical evaluation with mental status. [R. 300]. Plaintiff reported problems with his memory and attention ever since his 1985 car accident. *Id.* He also reported chronic steroid use and chronic back pain. *Id.* Plaintiff stated that he had been addicted to pain medications and steroids between 1987 and 1996 and that he had served time in prison for steroid use, sale of steroids, and violation of probation. [R. 300-301]. Dr. Seifer noted that Plaintiff's affect appeared mildly unhappy but generally appropriate and that Plaintiff reported "more severe mood than [was] present, on observation." [R. 301]. Plaintiff was found to be oriented, but he could not recall any of three items after an intervening task or any of three items after five minutes. *Id.* Dr. Seifer estimated that Plaintiff was functioning "within Low Average to Borderline limits with memory and attending difficulties, and concrete thoughts" and noted that Plaintiff's "judgment and insight" appeared "partial." [R. 302].

Dr. Seifer diagnosed Plaintiff with cognitive disorder, NOS, needing neurocognitive evaluation; dysthymic disorder; history of other substance dependence (anabolic steroids); and status post multiple body injuries, traumatic head injuries, chronic pain, and stomach aneurysm. [R. 302]. Dr. Seifer found that Plaintiff's prognosis could be improved with counseling, cognitive rehabilitation, and neurocognitive evaluation. *Id.* He also determined that Plaintiff appeared to have "moderate understanding and memory problems, and moderate-to-marked sustained concentration and persistent problems", as well as moderately impaired social

interaction and adaptation skills.  *Id.*

On March 29, 2012, the Social Security Administration issued a Disability Determination Explanation at the reconsideration level.  [R. 77-89].  This time, Plaintiff had a consultative psychological examination completed.  [R. 81].  It was determined that Plaintiff suffers from spine disorders, as well as severe organic mental disorders and non-severe affective disorders, but that he has mild restriction of activities of daily living, moderate difficulties in maintaining social functioning and in maintaining concentration, persistence and pace, and no repeated episodes of decompensation, each of extended duration.  [R. 82-83].  It was also determined that the evidence did not establish the presence of "C" criteria.  [R. 82].  Plaintiff was found to be "partially credible."  [R. 83].  It was determined that Plaintiff can lift and carry 20 pounds occasionally and 10 pounds frequently, can stand and/or walk for four hours out of an eight-hour workday, can sit for six hours out of an eight-hour workday, can push and/or pull an unlimited amount, can occasionally climb ramps and stairs, stoop, balance, kneel, crouch, and crawl, can occasionally climb ladders, ropes, and scaffolds, has no manipulative, visual or communicative limitations, and has environmental limitations in that he cannot have concentrated exposure to extreme cold, extreme heat, wetness, humidity, vibration, fumes, odors, dusts, gases, or poor ventilation, or hazards such as machinery and heights.  [R. 84-85].  Plaintiff was found to have moderate limitations in the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to interact appropriately with the general public, the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest

8

periods. [R. 86-87]. Moreover, it was determined that Plaintiff can perform light work and is not disabled. [R. 88].

On May 14, 2012, Plaintiff had an x-ray and an MRI of his cervical spine performed. [R. 328-30]. He was found to have degenerative vertebral spondylosis with chronic disease at the C5-C6 and C6-C7 disc levels, no acute osseous pathology, a medium-sized posterior disc herniation with bilateral degenerative foraminal narrowing and mild central canal stenosis at the C3-C4 level, medium-sized posterior disc herniations with bilateral narrowing and mild central canal stenosis at the C4-C5 and C5-C6 disc levels, a small posterior disc herniation with mild foraminal narrowing and no central canal stenosis at the C6-C7 disc level, and no vertebral fracture or bone marrow edema. *Id.*

On May 15, 2012, Plaintiff presented to Dr. Mohammad T. Javed for an initial evaluation of his neck pain. [R. 325]. Plaintiff complained of sharp shooting neck pain with radiation to both arms with associated tingling, numbness, and occasional weakness of the arms bilaterally that had been worsening for more than three months. *Id.* Plaintiff stated that he had tried multiple forms of treatment but they were all ineffective. *Id.* Plaintiff also explained that the pain worsened later in the day and with activity. *Id.* He stated that the pain was affecting his activities of daily life. *Id.* Dr. Javed noted that Plaintiff's x-ray showed degenerative arthritis and diagnosed Plaintiff with chronic neck pain and cervical radiculopathy. [R. 326]. On June 2, 2012, Plaintiff explained to Dr. Javed that the pain was worsening, that he had trouble sleeping, and that prior treatments had been ineffective. [R. 323]. Dr. Javed diagnosed Plaintiff with "cervical post lami and cervicalgia/neck", and Plaintiff refused trigger point shots. [R. 324].

On November 28, 2012, Plaintiff saw Dr. Javed for initial evaluation of abdominal pain and abscess formation. [R. 321]. Plaintiff stated that he had been experiencing lower abdominal

pain for the past few days and that it was getting worse.  *Id.*  The doctor diagnosed Plaintiff with nonspecific abdominal pain, adhesions of the intestine, and a left abdominal wall abscess.  [R. 322].  On November 29, 2012, Plaintiff presented to the emergency room at JFK Medical Center with shortness of breath and a skin infection.  [R. 559].  He was diagnosed with an abdominal abscess and either cellulitis or a spider bite, received IV antibiotics, and had the abscess irrigated and packed.  [R. 557, 573-74, 577].

On March 6, 2013, Plaintiff presented to Dr. Gordon Grenn[2] for the first time reporting chronic neck and back pain due to an auto accident he had as a teenager.  [R. 357].  Dr. Grenn noted Plaintiff's previous kidney dysfunction.  *Id.*  He also noted that Plaintiff had been addicted to pain medication years prior and had gone to rehabilitation, so Plaintiff did not want narcotics as part of his treatment.  *Id.*  Dr. Grenn also noted that Plaintiff had not been prescribed medication for several years.  *Id.*  Plaintiff reported pain in his neck which he could manage.  *Id.* He also reported pain in his lower back that was getting worse, pain radiating down both legs, an increase in pain due to walking and activity, and intermittent numbness to his left hip.  *Id.*  On March 7, 2013, Plaintiff had a normal x-ray of his chest completed.  [R. 378].  He also had an x-ray of his lumbar spine conducted,  and no osseous degenerative changes were noted.  [R. 379].  On March 18, 2013, Plaintiff told Dr. Grenn that he felt okay, but that he still suffered from severe low back pain radiating to both lower extremities.  [DE 356].  Plaintiff also reported difficulty ambulating.  *Id.*

On March 27, 2013, Plaintiff had a consult with Dr. Richard E. Eisenman.  [R. 468].  The doctor determined that Plaintiff suffered from diarrhea, generalized abdominal pain, a history of aneurysm of the heart wall, and a family history of colon cancer.  [R. 469].  He noted that

---

[2] A large portion of Dr. Grenn's notes are illegible.  [R. 346-57].

Plaintiff reported having dealt with diarrhea for several years, as well as occasional abdominal pain. *Id.* Dr. Eisenman prescribed medication. *Id.* On April 2, 2016, Plaintiff had the colonoscopy, and Dr. Eisenman noted an abnormal perianal exam, non-bleeding internal hemorrhoids, congested mucosa in the entire examined colon, and a normal cecum. [R. 471]. On April 15, 2013, Plaintiff saw Dr. Eisenman for a follow-up. [R. 466]. Plaintiff stated that he was getting better and that he still suffered from diarrhea, but not as badly. [R. 467]. Plaintiff also stated that his internal hemorrhoids did not bother him. *Id.*

Dr. S. Lipsman treated Plaintiff from April 8, 2013, through October 9, 2013, for neuropathy, an ankle sprain or strain, onychomycosis, tenosynovitis, a skin condition of his heels, infected ingrown toenails, calcaneal spurs, capsuilitis/tendonitis, traumatic plantar fasciitis, and onychia paronychia. [DE 428-62]. Dr. Lipsman treated Plaintiff with debridement, foot strapping, nail avulsion, and injections. *Id.* At one point, Dr. Lipsman noted that Plaintiff had a history of severe pain with difficulty walking and multiple bone spurs. [R. 437].

On April 22, 2013, Plaintiff had a MRI of his lumbar spine completed. [R. 377]. He was diagnosed with mild spondylosis of the lumbar spine; minimal annular disc bulge but no specific stenosis at the L1-L2 level; mild facet arthropathy but no significant stenosis at the L2-L3 level; mild annular disc bulge and mild facet arthropathy with mild neuroforaminal narrowing bilaterally at the L3-L4 level; diffuse broad annular disc bulge with mild facet arthropathy, ligamentum flavum thickening bilaterally, and mild canal stenosis with moderate neuroforaminal narrowing bilaterally at the L4-L5 level; and mild annular disc bulge, mild facet arthropathy, no significant canal stenosis, and mild neuroforaminal narrowing bilaterally at the L5-S1 level. *Id.*

On May 1, 2013, Plaintiff had an ultrasound of his abdomen completed. [R. 375]. He was determined to have hepatomegaly with diffuse increased echogenicity of the liver suggestive

of a diffuse hepatocellular process, as well as bilateral nephromegaly, and aneurysmal dilation of the right common iliac artery, and ectasia of the left common iliac artery.  *Id.*  Plaintiff also had a pelvic ultrasound on the same date that was unremarkable.  [R. 376].

On May 6, 2013, Plaintiff again saw Dr. Eisenman for a follow-up.  [R. 464].  Plaintiff reported that his stools were better with medication, and the doctor increased Plaintiff's medication and recommended a pancreatic enzyme.  [R. 465].

On May 9, 2013, Plaintiff presented to Dr. Steven Chang complaining of neck pain, back pain, and right leg pain.  [R. 341].  With regard to Plaintiff's lumbar spine, Dr. Chang found that Plaintiff was in moderate discomfort, Plaintiff's "range of motion flexion to proximal" was "one third of tibia", Plaintiff's range of motion for extension was 5 degrees, Plaintiff's range of motion caused exacerbation of back pain, there was tenderness to palpitation, Plaintiff's motor strength was 5/5 throughout his lower extremities, and Plaintiff's straight leg-raise test was negative bilaterally.  [R. 342].  With regard to Plaintiff's cervical spine, Dr. Chang found that Plaintiff was in moderate discomfort, Plaintiff's range of motion for flexion and for extension was 5 degrees, there was tenderness to palpitation, and Plaintiff's motor strength was 5/5 throughout his bilateral upper extremities.  *Id.*  Dr. Chang determined that Plaintiff suffered from cervical pain and lumbar pain and recommended physical therapy and further testing.  *Id.*

On June 19, 2013, Plaintiff had an MRI of his cervical spine performed.  [R. 344].  It was determined that he had congenital canal stenosis with superimposed multifactorial spondylosis of the cervical spine, but no cord compression or cord signal abnormalities.  *Id.*  It was also determined that Plaintiff had a T1 intraosseous lesion which may represent an atypical hemangioma.  [R. 345].

On July 8, 2013, Plaintiff again saw Dr. Chang for a re-evaluation as the symptoms

remained persistent.  [R. 339].  Dr. Chang diagnosed Plaintiff with cervical and lumbar pain, as well as muscle spasm.  [R. 340].  He prescribed medication.  *Id.*

On July 10, 2013, Plaintiff saw Dr. Gracy Joshua for an evaluation of his elevated hemoglobin, hematocrit.  [R. 392].  Plaintiff was diagnosed with familial polycythemia.  [R. 393].  Dr. Joshua noted that Plaintiff had elevated hemoglobin, hematocrit, in addition to some other abnormalities that needed to be worked up by a rheumatologist.  *Id.*

On July 22, 2013, Plaintiff had an MRI of his left foot completed.  [R. 435].  He was found to have a streaky T2 bright signal throughout the substance of the abductor hallucis muscle belly in the plantar medial aspect of the mid to hind foot, which could relate to muscle edema or myositis.  *Id.*  It was also determined that Plaintiff's plantar aponeurosis attachment onto calcaneus was intact and that there was no evidence of a full-thickness plantar fascia tear; however, there was a small amount of streaky T2 bright signal near the lateral calcaneal attachment of the abductor digiti minimi which could reflect mild perifascial edema/inflammation.  *Id.*  There was also evidence of mild tendinosis at the central plantar fascia attachment site subjacent to a small plantar calcaneal spur.  [R. 435-36].  Finally, there was marrow signal heterogeneity in the hallux sesamoids.  [R. 436].  It was determined that this probably degenerative sequelae could reflect sequela of sesamoiditis in the proper clinical setting.  *Id.*

On August 1, 2013, Plaintiff saw Dr. Baskaran Joshua for evaluation of the chronic pain in his neck, low back, and right hip.  [R. 388].  He was diagnosed with chronic pain syndrome, pain in his lower back, and cervical spondylosis.  [R. 389].  On the same date, Plaintiff saw Dr. Gracy Joshua.  [R. 390].  Dr. Joshua noted that Plaintiff's work-up was negative from a hematological standpoint in terms of any underlying blood disease.  [R. 391].

Plaintiff saw Dr. Chang on August 5, 2013, for re-evaluation.  [R. 336].  He was told to

13

continue taking his medication and to participate in physical therapy.  [R. 337].

On August 12, 2013, Plaintiff had an ultrasound of his abdomen completed due to his elevated liver function tests.  [R. 374].  It was determined that Plaintiff had an echogenic liver suggesting fatty infiltration, a prior cholecystectomy, and no biliary dilatation.  *Id.*

On August 12, 2013, Plaintiff saw Dr. Gracy Joshua for a follow-up on his erythrocytosis, and the doctor phlebotomized him.  [R. 383].  Plaintiff also saw Dr. Baskaran Joshua on the same date for a follow-up on the pain in his neck and low back.  [R.384].  Dr. Joshua noted that Plaintiff's symptoms were related to an old injury and that Plaintiff did not have inflammatory arthritis. [R. 387].  He prescribed medication.  *Id.*

On August 14, 2013, Plaintiff had a CT scan of his abdomen and pelvis performed.  [R. 417].  He was found to have a non-obstructing 2 mm right renal calculus and 3 x 1 mm calcification within the region of the common bile duct without evidence of ductal dilation.  *Id.* On the same date, Plaintiff had a CT scan of his abdomen and pelvis.  [R. 418].  He was found to have a left renal cyst and an additional sub-centimeter low-density legion with the left kidney.  *Id.*

On August 26, 2013, Plaintiff presented to Dr. Grenn continuing to complain of pain in his low back and neck, but stated that medication had improved his pain somewhat.  [R. 348]. Plaintiff also stated that his breathing had improved with weight loss, but that he suffered from severe left foot pain.  *Id.*

On September 3, 2013, Plaintiff saw Dr. Javed for a follow-up regarding his Type 2, non-insulin-requiring diabetes mellitus.  [R. 318-20].  Plaintiff reported blurred vision, fatigue, leg cramps, polydipsia, polyphagia, polyuria, and weakness.  [R. 319].  Dr. Javed noted that Plaintiff's past treatments had been unsuccessful and that the severity of Plaintiff's condition was worsening over time.  *Id.*  Plaintiff stated that his blood sugars taken at home were fasting 120's

to 150's.  *Id.*  Dr. Javed prescribed medication and ordered blood tests.  [R. 494].

On September 4, 2013, Plaintiff saw Dr. Gracy Joshua, and the doctor did a phlebotomy on Plaintiff and encouraged Plaintiff to attend his primary care doctor appointments due to his weight gain and shortness of breath.  [R. 381].  Dr. Joshua determined that Plaintiff's pulse oximetry was 97% saturation and noted that Plaintiff reported feeling better after the phlebotomy.  *Id.*

On September 9, 2013, Plaintiff saw Dr. Jesse Eisenman for his heartburn, bloating, and diarrhea.  [R. 411].  Dr. Eisenman determined that Plaintiff had mild congestion in the entire colon and diagnosed Plaintiff with elevated liver enzymes, aortic aneurysm, and diarrhea.  *Id.*  Dr. Eisenman recommended further tests and medication.  *Id.*  Dr. Eisenman also stated that none of the limitations listed on the form he completed, which involved Plaintiff's ability to stand, sit, work, lift, etc., pertained to his treatment of Plaintiff.  *Id.*

On September 13, 2013, Plaintiff saw Dr. Arul Chidambaram for his dilated right common iliac artery.  [R. 400].  The doctor noted that, distally, there was no evidence of any vascular deficit, but that Plaintiff did have findings of chronic venous stasis.  [R. 401].  The doctor recommended that Plaintiff wear compression stockings and lose weight.  *Id.*

On September 16, 2013, Plaintiff saw Dr. Chang again and reported that his symptoms were somewhat improved but remained significant.  [R. 333].  Plaintiff had been taking his medications and undergoing physical therapy/chiropractic care.  *Id.*  Plaintiff's prescriptions were refilled and Dr. Chang discussed with him the option of lumbar epidural steroid injections and trigger point injections.  [R. 334].

On September 23, 2016, Plaintiff again saw Dr. Grenn, complaining of moderate to severe pain in his neck, low back, and left leg.  [R. 348].  Plaintiff stated that he was depressed and overwhelmed because he was unable to work.  *Id.*  He also stated that he was getting a

phlebotomy every ten days and that he was seeing a doctor for his foot pain. *Id.* Dr. Grenn noted that Plaintiff was ambulating slowly. *Id.* On the same date, Plaintiff also saw Dr. Baskaran Joshua complaining of aches and pains, mainly in the neck and low back. [R. 538]. The doctor told Plaintiff to take Naproxen for the pain and advised Plaintiff to avoid any narcotics for chronic pain. [R. 541].

On September 24, 2013, Dr. Lipsman completed a Medical Statement Regarding Illnesses, Physical Abilities and Limitations for Social Security Disability Claim [R. 331]. He listed Plaintiff's symptoms as heel and ankle pain, arch pain, and pain in the lower leg. *Id.* Dr. Lipsman found that Plaintiff had difficulty walking and standing due to pain and that Plaintiff had chronic heel wounds in both feet. *Id.* He diagnosed Plaintiff with traumatic plantar fasciitis, bilaterally, heel calcification, and tendonitis. *Id.* Dr. Lipsman explained that he had treated the impairments with injections, compression dressings, immobilization, and fabrication of an ankle and foot orthosis for the left foot and ankle. *Id.* He determined that Plaintiff could stand for 15 minutes at one time, could sit for 60 minutes at one time, could work between one hour maximum per day, could lift five pounds on an occasional basis, and could lift nothing on a frequent basis, and could never stoop, bend, or balance. *Id.* Dr. Lipsman opined that Plaintiff suffered from moderate to severe pain. *Id.*

On September 26, 2013, Plaintiff saw Dr. Jack Zeltzer for assessment of his peripheral vasculature. [R. 398]. Plaintiff reported having problems with his incision from his abdominal aortic aneurysm resection several years ago and also complained of discomfort in the lower extremities. *Id.* Dr. Zeltzer suggested that Plaintiff have further testing and noted that the examination did not reveal any issues. [R. 399].

Plaintiff saw Dr. Gracy Joshua on September 30, 2013, for a follow-up, and Dr. Joshua

16

noted that Plaintiff was having periodic phlebotomies. [R. 514]. Plaintiff explained that he became short of breath at times and that he had gained some weight. *Id.* Plaintiff had another phlebotomy performed and stated that he felt better afterwards. [R. 515].

On October 21, 2013, Dr. Grenn completed a Medical Statement Regarding Illnesses, Physical Abilities and Limitations for Social Security Disability Claim. [R. 487]. He described Plaintiff's symptoms as neck pain, low back pain, bilateral hip pain radiating into lower extremities, diarrhea, and depression. *Id.* Dr. Grenn listed Plaintiff's disabilities as cervical spondylosis, chronic pain syndrome, depression, polycythemia, low back pain, neuropathy, diarrhea, and abdominal aneurysm repair. *Id.* Dr. Grenn found that Plaintiff could stand for 15 minutes at a time, could sit for 15 minutes at a time, could work for zero hours per day, could lift 20 pounds on an occasional basis, could lift 10 pounds on a frequent basis, could occasionally bend, could never stoop, could never balance, could frequently manipulate with his right and left hands, and could occasionally raise his left and right arms over shoulder level. *Id.* Dr. Grenn described Plaintiff's pain as between moderate and severe. *Id.*

On October 21, 2013, Plaintiff saw Avril Dhana, ARNP, for re-evaluation of his neck, right leg, and back pain after he had completed therapy/chiropractic care and taken medications as prescribed. [R. 489]. Plaintiff stated that he planned on having left ankle surgery and a right thigh aneurysm repair soon. *Id.* Plaintiff reported moderate discomfort during the physical examination. [R. 490]. He agreed to continue taking his medication, and the treatment option of cervical facet injections and trigger point injections was discussed. *Id.*

On October 30, 2013, Plaintiff had an MRI of his left ankle performed due to his lateral ankle pain. [R. 607]. It was determined that Plaintiff had a C-shaped configuration of peroneus brevis distal to lateral malleolus compatible with partial split tear, no evidence of full-thickness

17

peroneus brevis or longus tendon tear, anterior talofibular ligament tear, thickened appearance of posterior tibialis tendon with intra-substance intermediate signal at calcaneal attachment site, moderately extensive fasciitis/partial tear involving plantar aponeurosis at the calcaneal attachment site, and subcutaneous edema throughout the ankle, most prominent in the anterolateral aspect.  [R. 608].

On November 6, 2013, Plaintiff had a computed tomographic angiography of the abdomen, pelvis and bilateral lower extremity runoff completed.  [R. 549].  It was determined that he had mild bibasilar scarring and atelectasis, diffuse fatty infiltration of the liver, postsurgical changes with multiple surgical clips in the deep mesenteric region, apparent occlusion at the origin of the celiac axis with reconstitution of celiac branch vessels via SMA collaterals supply, no evidence of abdominal aortic aneurysm, a healed fracture deformity of the proximal shaft of the right femur, and mild, diffuse subcutaneous edema of the distal calves and ankles bilaterally.  [R. 550].

On November 11, 2013, Dr. Gracy Joshua completed a Medical Statement Regarding Illnesses, Physical Abilities and Limitations for Social Security Disability Claim [R. 551].  Dr. Joshua listed Plaintiff's symptoms as abdominal pain, headaches, shortness of breath, and back pain.  *Id.*  Dr. Joshua listed Plaintiff's diagnoses as polycythemia and neck and lower back pain. *Id.*  Dr. Joshua found that Plaintiff could stand for 15 minutes at one time, could sit for 30 minutes at one time, could work zero hours per day, could lift five pounds occasionally, could lift five pounds frequently, could occasionally bend, stoop and balance, could never manipulate his right or left hand or lift his right or left arm over shoulder level, and needed to elevate his legs most of the time.  *Id.*  Dr. Joshua opined that Plaintiff suffered from severe pain.  *Id.*

### C.  ALJ Decision

The ALJ issued her decision on Plaintiff's claim for benefits on January 9, 2014.  [R.

17-30]. The ALJ explained the five-step sequential evaluation process for determining whether an individual is disabled. [R. 17-19]. She found that Plaintiff had not engaged in substantial gainful activity since December 12, 2011, the application date. [R. 19]. The ALJ then found that Plaintiff suffers from the following severe impairments: degenerative disc disease of the cervical spine, spondylosis, lumbosacral disc protrusion, hypertension, cognitive disorder, and dysthymic disorder. *Id.* She noted Plaintiff's fatty liver and explained that Plaintiff's "reported symptoms, including his abdominal plain, were not related to that diagnosis, and neither the gastroenterologist or primary care physician prescribed any treatment. This condition was to be monitored, and there is no indication that the claimant's fatty liver imposes any functional limitations." *Id.* The ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. *Id.* She explicitly determined that there was no evidence of "nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis that meets the criteria of section 1.04 of the Listing of Impairments." [R. 20].

The ALJ also found that the severity of Plaintiff's mental impairments, considered both individually and in combination, "do not meet or medically equal the criteria of listings 12.04 and 12.06." [R. 20]. She determined that, based upon the record evidence, the relevant portion of which she summarized, the "paragraph B" criteria were not met because Plaintiff has only mild restriction in activities of daily living, mild difficulties in social functioning, moderate difficulties with concentration, persistence, or pace, and has experienced no episodes of decompensation, which would have been of an extended duration. [R. 20-21]. The ALJ next determined that the "paragraph C" criteria were not met because Plaintiff "has had repeated episodes of deterioration or decompensation, does not have a residual disease process, and is able to function within a

19

normal home environment."  [R. 21]

The ALJ explained that her residual capacity assessment reflected the degree of limitation she had found in the "paragraph B" mental function analysis.  [R. 21].  She then found that Plaintiff has

> the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except he can occasionally climb, balance, stoop, kneel, crouch, and crawl, he can occasionally work around extreme cold and heat, wetness and humidity, noise, vibration, fumes, odors, dust, and gases, [sic] proximity to moving mechanical parts, and work in high exposed places, and he can perform simple routine tasks on a sustained basis over a normal 8 hour workday in a stable work environment with no more than simple decision making.  He is unable to perform complex and detailed tasks or meet fast paced, high production demands.

[R. 22].  The ALJ attested that she had considered all of Plaintiff's symptoms and "the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as all of the opinion evidence.  *Id.*  She then followed the two-step process—first, determining whether there is an underlying determinable physical or mental impairment that could reasonably be expected to produce Plaintiff's pain or other symptoms, and then evaluating the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they limit her functions.  *Id.*  The ALJ summarized Plaintiff's testimony and found that the "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."  [R. 22-23].  She went through the various records in detail, including Plaintiff's issues with his feet.  [R. 23-29].

The ALJ found that the "[m]edical evidence confirms that the claimant has been diagnosed with several medical conditions that impact his functioning but do not prevent him from engaging

20

in work activity." [R. 26]. She listed several reasons for not finding Plaintiff's testimony as a whole to be credible. *Id.* For example, Plaintiff claimed his musculoskeletal complaints stemmed from a car accident in 1985, but he worked as a personal trainer and a stocker through 2002 and was incarcerated for steroid use, "which indicates that he was involved in some sort of body building activity in spite of his significant injuries." *Id.* The ALJ pointed out that "[t]here is no medical evidence in the record whatsoever regarding Plaintiff's neck, back, and joint pain that relates to either the time of the accident or his application, his alleged onset date of January 1, 2008, or his application for supplemental security income benefits, which was filed in December 2011." *Id.* The ALJ noted that Plaintiff's "credibility has been called into question given his unsupported allegations as well as his earnings record, which records minimal earnings, despite the fact that the claimant stated that he was working as a personal trainer and in his family grocery store at the same time." *Id.* She explained that Plaintiff "stated in his work history report that he worked as a male model (Ex. 4E), yet he denied that he did so, stating that he only wanted to work as a male model. The claimant signed this document and failed to convincingly state why he would list a job that he only wanted and gave a time frame for the job that he supposedly did not have." *Id.*

The ALJ explained that "Dr. Lipsman's notes, which only document treatment from May 2013 through September 2013 were impossible to decipher and primarily consist of billing records without an adequate description of the claimant's examinations or treatment course." [R. 27]. She determined that Plaintiff is limited to performing light work with the limitations described in the RFC because Plaintiff "does have neck and back pain with positive MRI findings." [R. 28]. She further explained that Plaintiff can perform "simple, routine tasks on a sustained basis in a stable work environment with no more than simple decision making, which takes into account his

deficiencies in attention and concentration." *Id.*

The ALJ specifically discussed Dr. Lipsman's findings, diagnosis, and treatment of Plaintiff. [R 28]. She also specifically discussed Dr. Grenn's and Dr. Gracy Joshua's findings regarding Plaintiff. *Id.* The ALJ found that "other than Dr. Eisenman, who indicated that his treatment did not impact the claimant exertionally or non-exertionally, these physician assessments exceed the claimant's limitations based on the objective testing, examination findings, and treatment course." [R. 28-29]. She further found that the "enumerated sitting and standing limitations and diminished postural activities, as well as the assessments regarding his total inability to work are not consistent with the physician progress notes and objective findings and are not accorded substantial weight in accordance with Social Security Ruling 96-2p." [R. 29]. The ALJ did give substantial weight to the state agency medical consultant, "other than finding that the claimant can stand/walk for 6, rather than 4 hours in an 8 hour workday", and with the state agency psychological consultant, "other than finding that the claimant has mild limitations in his social interactions as there is no evidence of significant difficulties in that area." *Id.* The ALJ ultimately concluded that her RFC "is supported by the imaging studies, which indicated mild stenosis and no cord compression, [Plaintiff's] relatively normal neurological examinations, and his conservative treatment for his ailments as a whole. The claimant has not undergone mental health treatment but is limited to simple repetitive tasks." *Id.*

The ALJ next found that Plaintiff has no past relevant work. [R. 29]. She noted that Plaintiff was a younger individual (18-49 years old) on the date the application was filed, that he has at least a high school education, that he is able to communicate in English, and that transferability of job skills is not an issue because he has no past relevant work. *Id.* The ALJ determined that "[c]onsidering the claimant's age, education, work experience, and residual

22

functional capacity, there are jobs that exist in significant numbers in the national economy that claimant can perform (20 CFR 416.969 and 416.969(a))."  *Id.*

The ALJ considered the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2 [R. 29].  She explained that Plaintiff cannot perform the full range of light work, so, as required, the ALJ asked the vocational expert whether jobs exist in the national economy for an individual with Plaintiff's age, education, work experience, and RFC.  [R. 29-30].  The ALJ noted that the vocational expert had testified that such an individual would be able to perform the requirements of representative occupations such as price merchandiser, silver wrapper, and shellfish preparer.  [R. 30].  The ALJ determined that the "vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles."  *Id.*  The ALJ concluded that Plaintiff has not been under a disability since December 12, 2011, the date the application was filed.  *Id.*

## II. MOTIONS FOR SUMMARY JUDGMENT

In his Motion for Summary Judgment, Plaintiff makes three main arguments.  [DE 22]. First, he argues that the ALJ erred by discounting the opinions of his three treating physicians.  *Id.* Next, Plaintiff asserts that the ALJ's decision should be reversed because the ALJ improperly rejected Plaintiff's foot impairments as severe impairments.  *Id.*  Finally, he contends that the ALJ improperly discounted his testimony regarding his subjective complaints.  *Id.*

In Defendant's Motion for Summary Judgment with Supporting Memorandum of Law and Response to Plaintiff's Motion for Summary Judgment, she first argues that substantial evidence supports the ALJ's RFC determination and that the ALJ properly considered the treating sources' opinions and gave them reduced weight because they were inconsistent with the other evidence in the record.  [DE 23].  Second, Defendant maintains that the ALJ properly discussed Plaintiff's

foot impairments, considered all of Plaintiff's physical impairments in the aggregate at step two of the sequential evaluation, and considered the combined effects of Plaintiff's impairments in evaluating his claim.  *Id.*   Third, Defendant contends that the ALJ properly evaluated Plaintiff's subjective complaints pursuant to the Social Security regulations and Eleventh Circuit case law. *Id.*

### III. <u>LEGAL ANALYSIS</u>

Judicial review of the factual findings in disability cases is limited to determining whether the Commissioner's decision is "supported by substantial evidence and based on proper legal standards.   Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."   42 U.S.C. § 405(g); *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (per curiam) (internal citation omitted) (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997)).   Courts may not "decide the facts anew, reweigh the evidence, or substitute [their] judgment for that of the [Commissioner]." *Phillips v. Barnhart*, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

The restrictive standard of review set out above applies only to findings of fact.   No presumption of validity attaches to the Commissioner's conclusions of law. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "The [Commissioner's] failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining the proper legal analysis has been conducted mandates reversal." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991)).

Social Security regulations establish a five-step sequential analysis to arrive at a final

determination of disability.  20 C.F.R. § 404.1520; 20 C.F.R. § 416.920 (a)-(f).  The ALJ must first determine whether the claimant is presently employed.  If so, a finding of non-disability is made, and the inquiry concludes.  20 C.F.R. § 404.1520(b).  In the second step, the ALJ must determine whether the claimant suffers from a severe impairment or combination of impairments. If the ALJ finds that claimant does not suffer from a severe impairment or combination of impairments, then a finding of non-disability results, and the inquiry ends.  20 C.F.R. § 404.1520(c).

Step three requires the ALJ to compare the claimant's severe impairment(s) to those in the listing of impairments.  20 C.F.R. § 404.1520(d), subpart P, appendix I.  Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that, if they are established, the regulations require a finding of disability without further inquiry into the claimant's ability to perform other work.  *See Gibson v. Heckler*, 762 F.2d 1516, 1518, n. 1 (11th Cir. 1985).  If the impairment meets or equals a listed impairment, disability is presumed and benefits are awarded.  20 C.F.R. § 404.1520(d).

Step four involves a determination of whether the claimant's impairments prevent him or her from performing his or her past relevant work.  If the claimant cannot perform his or her past relevant work, then a *prima facie* case of disability is established.  20 C.F.R. § 404.1520(e).  The burden then shifts to the ALJ to show at step five that, despite the claimant's impairments, he or she is able to perform work in the national economy in light of the claimant's RFC, age, education, and work experience.  20 C.F.R. § 404.1520(f); *Phillips*, 357 F. 3d at 1239.  In order to determine whether the claimant has the ability to adjust to other work in the national economy, the ALJ may either apply the Medical Vocational Guidelines, 20 C.F.R. pt. 404 subpt. P, app.2, or utilize the assistance of a vocational expert.  *See Phillips*, 357 F. 3d at 1239-40.

25

A.   Whether the ALJ erred in her consideration of Plaintiff's treating physicians

Plaintiff asserts the ALJ should have given the medical opinions of his treating physicians, Dr. Gracy Joshua, Dr. Lipsman, and Dr. Grenn, controlling weight rather than relying on the state agency medical consultant, a non-examining doctor.   [DE 22, pp. 14-15].   Defendant argues that the ALJ considered the medical opinions of the treating physicians and properly gave them reduced weight because they were inconsistent with the other evidence in the record, including objective testing, examination findings, and Plaintiff's course of treatment.   [DE 23, pp. 10-14].

The Eleventh Circuit Court of Appeals has explained that an ALJ "may reject the opinion of any physician when the evidence supports a contrary conclusion," but that the ALJ is required "to state with particularity the weight he gives to different medical opinions and the reasons why." *McCloud v. Barnhart*, 166 Fed.Appx. 410, 418-419 (11th Cir. 2006) (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983); *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987)).   The opinion of a treating physician, such as Dr. Gracy Joshua, Dr. Lipsman, and Dr. Grenn, "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Lewis*, 125 F.3d at 1440.   "[G]ood cause" exists when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips*, 357 F.3d at 1241.   If the ALJ decides to disregard the opinion of a treating physician, the ALJ must clearly articulate his or her reasons for doing so.   *Id.*

Dr. Gracy Joshua, Dr. Lipsman, and Dr. Grenn all completed Medical Statements Regarding Illnesses, Physical Abilities and Limitations for Social Security Disability Claim [R.

26

331, 487, 551].[3]  In those Medical Statements, they opined as to Plaintiff's ability to stand, sit, work, lift, stoop, balance, manipulate with his hands, raise his arms, and need to elevate his legs, as well as Plaintiff's pain level.

The ALJ specifically discussed in great detail Dr. Lipsman's, Dr. Grenn's, and Dr. Gracy Joshua's findings, diagnoses, and treatment of Plaintiff in her decision.  [R 20, 25, 27-28].  The ALJ then found that "other than Dr. Eisenman, who indicated that his treatment did not impact the claimant exertionally or non-exertionally, these physician assessments exceed the claimant's limitations based on the objective testing, examination findings, and treatment course."  [R. 28-29].  She further found that the "enumerated sitting and standing limitations and diminished postural activities, as well as the assessments regarding his total inability to work are not consistent with the physician progress notes and objective findings and are not accorded substantial weight in accordance with Social Security Ruling 96-2p."  [R. 29].  The ALJ did give substantial weight to the state agency medical consultant, "other than finding that the claimant can stand/walk for 6, rather than 4 hours in an 8 hour workday."  *Id.*  The ALJ ultimately concluded that her RFC "is supported by the imaging studies, which indicated mild stenosis and no cord compression, [Plaintiff's] relatively normal neurological examinations, and his conservative treatment for his ailments as a whole.  The claimant has not undergone mental health treatment but is limited to simple repetitive tasks."  *Id.*

The ALJ explicitly wrote that she was not giving the three treating physicians' medical opinions substantial weight.  Additionally, the ALJ sufficiently explained why she was not giving the three treating physicians' opinions substantial weight.  Therefore, the only issue is whether

---

[3] The Court has carefully reviewed theses three "Medical Statements."   Each one is an identical one-page fill-in-the-blank form with portions circled by each doctor and a few lines filled in by each doctor.

the ALJ had good cause to not accord the opinions of the three treating physicians substantial weight. The Court notes that the three doctors treated different parts of Plaintiff's body and treated and diagnosed different health problems that are somewhat unrelated. This is a not a situation where three doctors who specialize in the same area all treated Plaintiff for the same illness and then the ALJ disagreed with all three of their medical opinions.

With regard to Dr. Lipsman, who is a podiatrist, Plaintiff only saw the doctor from the end of April 2013 through September 2013. The Court agrees with the ALJ's finding that "Dr. Lipsman's notes, which only document treatment from May 2013 through September 2013 were impossible to decipher and primarily consist of billing records without an adequate description of the claimant's examinations or treatment course." [R. 27]. Moreover, Dr. Lipsman's notes, to the extent they were legible, do not explicitly state or even imply that Plaintiff cannot sit, stand, lift weight, or work. Dr. Lipsman's treatment of Plaintiff was relatively limited and consisted of minor treatment including debridement, foot strapping, nail avulsion, and injections. Plaintiff reported to Avril Dhana, ARNP, on October 21, 2013, that he planned on having left ankle surgery soon [R. 489], but there is no evidence that he actually had the surgery. The ALJ properly discounted Dr. Lipsman's findings regarding Plaintiff's limitations when Dr. Lipsman's notes do not support the findings. The relevant MRIs [R. 435, 607] also do not support the limitations determined by Dr. Lipsman.

With regard to Dr. Grenn, who is a doctor of osteopathic medicine specializing in family medicine, his notes also fail to even imply that Plaintiff could only stand for 15 minutes at a time, could only sit for 15 minutes at a time, could work for zero hours per day, could only lift 20 pounds on an occasional basis, could only lift 10 pounds on a frequent basis, could only occasionally bend, could never stoop, could never balance, could frequently manipulate with his right and left hands,

28

and could occasionally raise his left and right arms over shoulder level. Dr. Grenn's notes primarily contain simple parroting back of Plaintiff's own subjective complaints. The Court has independently carefully reviewed the entirety of the medical evidence in this case, including the multiple MRIs, X-rays, other tests, and treatment notes, which are summarized in detail above, and agrees with the ALJ that they do not support Dr. Grenn's finding of Plaintiff's limitations. The Court also notes that Plaintiff was offered more intensive treatment of lumbar epidural steroid injections and trigger point injections on multiple occasions, and Plaintiff opted not to go forward with the treatment. *See* R. 324, 334, and 490. Moreover, the state agency medical consultant determined that Plaintiff's limitations were much less than what Dr. Grenn found. Finally, the ALJ properly found that Dr. Grenn's findings regarding Plaintiff's limitations were not consistent with his own notes or the objective medical evidence, yet the ALJ accounted in her RFC for Plaintiff's "neck and back pain with positive MRI findings." [R. 28].

With regard to Dr. Gracy Joshua, Plaintiff's hematologist, the doctor's treatment notes discuss Plaintiff's blood results and the fact that he did not have a blood disease and state that Plaintiff felt better after he had phlebotomies performed. The notes also mention Plaintiff's weight gain as a cause of his shortness of breath. Therefore, it is unclear why Dr. Gracy Joshua even opined as to Plaintiff's limitations and inability to work. Dr. Baskaran Joshua was the one who treated Plaintiff for back and neck pain; however, Dr. Baskaran Joshua never formally determined Plaintiff's limitations. Moreover, Dr. Gracy Joshua's notes do not provide any possible basis whatsoever for the doctor determining Plaintiff's severe limitations as to sitting, standing, lifting, raising his arms, and manipulating his hands. The ALJ properly found that Dr. Gracy Joshua's findings regarding Plaintiff's limitations were not consistent with the doctor's own notes or the objective medical evidence.

The Court finds that the ALJ did have good cause to not give the medical opinions of his treating physicians, Dr. Gracy Joshua, Dr. Lipsman, and Dr. Grenn, substantial weight because the evidence did support a contrary finding, the opinions were not bolstered by the evidence, and the opinions were conclusory or inconsistent with the doctors' own medical records.

B.   Whether the ALJ erred in rejecting Plaintiff's foot impairments as severe impairments

Plaintiff argues that the ALJ should have listed Plaintiff's foot impairments, including bilateral traumatic plantar fasciitis, heel calcification, and tendonitis, as severe impairments.   [DE 22, p. 17].   Plaintiff contends that Dr. Lipsman's diagnosis is supported by the objective medical evidence of record and that Dr. Lipsman "advised as to what limitations would be attributable to those impairments."   *Id.*   Plaintiff further argues that the ALJ should have included Plaintiff's foot impairments in the residual functional capacity findings and should have included them in the hypotheticals the ALJ posed to the vocational expert.   *Id.* at p. 18.

Defendant contends that the ALJ did note Plaintiff's foot impairments but did not find them to be severe.   [DE 23, p. 8].   Defendant also argues that the ALJ properly "considered all of [Plaintiff's] physical impairments in the aggregate when determining the physical limitations to include in the RFC determination."   *Id.* at p. 9.   Defendant maintains that the ALJ properly considered the combined effects of Plaintiff's impairments, properly considered all of Plaintiff's impairments and symptoms in evaluating the credibility of his subjective claims and in assessing his RFC, and is supported by the substantial evidence.   *Id.*

An ALJ is required at step two of 20 C.F.R. § 404.1520 to determine whether the claimant's impairment is severe or not severe.   "Step two is a threshold inquiry.   It allows only claims based on the most trivial impairments to be rejected.   The claimant's burden at step two is mild.   An impairment is not severe only if the abnormality is so slight and its effect so minimal

that it would clearly not be expected to interfere with the individual's ability to work . . . ." *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986). The Eleventh Circuit Court of Appeals has further explained that, "if no severe impairment is shown [at step two] the claim is denied, but the finding of any severe impairment, whether or not it qualifies as a disability and whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe, is enough to satisfy the requirement of step two." *Jamison v. Brown*, 814 F.2d 585, 588 (11th Cir. 1987). As the ALJ continues to steps three, four, and five of the required analysis, the ALJ "is to consider the claimant's entire medical condition, including any impairment or combination of impairments, whether severe or not." *Childers v. Social Sec. Admin., Comm'r*, 521 Fed. Appx. 809, 811 (11th Cir. 1013) (citing *Jamison*, 814 F.2d at 588).

At step two of the required analysis, the ALJ found that Plaintiff suffers from the following severe impairments: degenerative disc disease of the cervical spine, spondylosis, lumbosacral disc protrusion, hypertension, cognitive disorder, and dysthymic disorder. [R. 19]. At step three of the required analysis, the ALJ explicitly stated that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.95 and 416.96). *Id.* At step four, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these statements are not entirely credible..." [R. 23].

The ALJ specifically explained in her decision that Dr. Lipsman assessed Plaintiff with neuropathy, traumatic plantar fasciitis, and onychia paronychia in April 2013. [R. 25]. She noted Defendant's MRI results from July 2013 and October 2013 in detail. *Id.* She then noted

31

that Plaintiff "treated with a podiatrist for left foot and ankle pain with MRI findings that indicate the presence of plantar fasciitis and tendonitis and partial tears in the ankle were seen in the October 2013 MRI." [R. 27]. She went on to explain that "Dr. Lipsman's notes, which only document treatment from May 2013 through September 2013 were impossible to decipher and primarily consist of billing records without an adequate description of the claimant's examinations or treatment course." *Id.*

The Court first finds that the ALJ very clearly considered Plaintiff's entire medical condition in the aggregate in evaluating Plaintiff's RFC and the credibility of Plaintiff's subjective claims. The Court next finds that the record evidence supports the ALJ's finding that there is insufficient evidence in the record to show Plaintiff's foot problems were severe.

C.   <u>Whether the ALJ erred in discounting Plaintiff's testimony regarding his subjective complaints</u>

Plaintiff argues that the ALJ failed to apply the three-part pain standard when she rejected Plaintiff's complaints regarding his subjective symptoms. [DE 22, p. 19]. Plaintiff contends that a combination of Plaintiff's mental and physical impairments "could reasonably cause the subjective complaints to which he testified." *Id.* at p. 20. Plaintiff asserts that the ALJ first discounted Plaintiff's credibility because she found "that there was no medical evidence to support his claim at the time of the alleged onset of his disability or at the time of the filing for SSI." *Id.* at p. 21. However, Plaintiff argues that "during the relevant time period for the determination of disability, there is a plethora of objective medical evidence...which supports his subjective complaints." *Id.* Plaintiff contends that the ALJ also discounted his credibility "because he reported in a work history report that he had worked as a male model and then at the hearing denied ever working in that occupation." *Id.* Plaintiff explains that he never actually made any money

32

as a male model and made a mistake when he reported that he had.  *Id.*

Defendant argues that substantial evidence supports the ALJ's credibility determination. [DE 23, p. 16].  Defendant contends that the record supports the ALJ's findings regarding (1) Plaintiff's lack of medical evidence to support his claim at the time of the alleged onset of his disability or at the time of filing for SSI and (2) Plaintiff's production of a work history report that stated that he was a male model followed by his contradictory hearing testimony that he was not. *Id.* at pp. 16-17.  Defendant also notes that the ALJ "articulated a number of other reasons supporting the adverse credibility determination, none of which Plaintiff has challenged on appeal."  *Id.* at p. 17.

The three-part pain standard requires: "(1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain."  *Holt v. Sullivan,* 921 F.2d 1221, 1223 (11th Cir. 1991). The ALJ here attested that she had considered all of Plaintiff's symptoms and "the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as all of the opinion evidence.  *Id.* She then followed the two-step process—first, determining whether there is an underlying determinable physical or mental impairment that could reasonably be expected to produce Plaintiff's pain or other symptoms, and then evaluating the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they limit her functions.  [R. 22]. The ALJ summarized Plaintiff's testimony and found that the "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimants statements concerning the intensity, persistence and limiting effects of these

symptoms are not entirely credible for the reasons explained in this decision." [R. 22-23].

The ALJ found that the "[m]edical evidence confirms that the claimant has been diagnosed with several medical conditions that impact his functioning but do not prevent him from engaging in work activity." [R. 26]. She listed several reasons for not finding Plaintiff's testimony as a whole to be credible. *Id.* For example, Plaintiff claimed his musculoskeletal complaints stemmed from a car accident in 1985, but he worked as a personal trainer and a stocker through 2002 and was incarcerated for steroid use, "which indicates that he was involved in some sort of body building activity in spite of his significant injuries." *Id.* The ALJ pointed out that "[t]here is no medical evidence in the record whatsoever regarding Plaintiff's neck, back, and joint pain that relates to either the time of the accident or his application, his alleged onset date of January 1, 2008, or his application for supplemental security income benefits, which was filed in December 2011." *Id.* The ALJ noted that Plaintiff's "credibility has been called into question given his unsupported allegations as well as his earnings record, which records minimal earnings, despite the fact that the claimant stated that he was working as a personal trainer and in his family grocery store at the same time." *Id.* She explained that Plaintiff "stated in his work history report that he worked as a male model (Ex. 4E), yet he denied that he did so, stating that he only wanted to work as a male model. The claimant signed this document and failed to convincingly state why he would list a job that he only wanted and gave a time frame for the job that he supposedly did not have." *Id.*

The Court finds that the ALJ followed the "pain standard" discussed in *Holt*. As stated in *Holt*: "If the ALJ decides not to credit such testimony, he must articulate explicit and adequate reasons for doing so." 921 F.2d at 1223. After a careful review of the record, the Court finds that the ALJ did articulate several explicit and adequate reasons for discrediting Plaintiff's

testimony.   This Court cannot reweigh the evidence.

With regard to the issue of whether Plaintiff was untruthful about having been a male model, the ALJ explicitly rejected Plaintiff's argument at the hearing about why he had included the male model job on his work history report when he had never actually been a male model. The ALJ made a proper credibility determination.   Second, Plaintiff argues that the ALJ improperly found that there is a dearth of medical evidence regarding Plaintiff's neck, back, and joint pain that relates to either the time of the accident or his application, his alleged onset date of January 1, 2008, or his application for supplemental security income benefits, which was filed in December 2011.   While some of the medical records generally refer to Plaintiff's accident and the resulting trauma, the Court notes that there is a lack of evidence regarding Plaintiff's pain prior to 2012.   Furthermore, even if the Court agreed with Plaintiff on the two points above, the ALJ provided several other reasons for finding Plaintiff's testimony not to be credible.

The Court finds that the ALJ's decision to discount Plaintiff's testimony about his subjective complaints is not erroneous in light of the record evidence.   This is a case with an abundance of objective medical information which supports the ALJ's finding.   There is substantial evidence to support the ALJ's denial of benefits to Plaintiff.

## IV. <u>CONCLUSION</u>

In light of the foregoing, it is hereby **ORDERED AND ADJUDGED** that the decision of the Commissioner is **AFFIRMED**.   Accordingly, Plaintiff's Motion for Summary Judgment [DE 22] is hereby **DENIED**, and Defendant's Motion for Summary Judgment [DE 23] is hereby **GRANTED**.

**ORDERED AND ADJUDGED** in Chambers at West Palm Beach, Palm Beach County,

Florida, this **23** cd day of August, 2016.

WILLIAM MATTHEWMAN
United States Magistrate Judge